<hr />

**Henry H. Kennedy and Harry A. Daugherty, Executors, Appellees, v. Aetna Life Insurance Company, Appellant.**

### Gen. No. 14,426.

1.  INSURANCE—*when recovery upon accident policy sustained.* *Held*, under the evidence, the recovery awarded was properly sustained in that the evidence, circumstantial in character, tended to show that the death of the insured resulted from a cause covered by and included within the terms of the policy in suit.

2.  EVIDENCE—*effect of circumstantial.* If a fact be not susceptible of direct proof, circumstantial evidence is not only competent to establish such fact but frequently is more satisfactory and convincing in character than direct testimony would have been.

Assumpsit. Appeal from the Circuit Court of Cook county; the Hon. MERRITT W. PINCKNEY, Judge, presiding. Heard in this court at the March term, 1908. Affirmed. Opinion filed May 3, 1909.

**Statement by the Court.** This is an action for a death claim under an accident policy of insurance issued by the defendant company to the plaintiffs' testator, James A. Fullenwider.

The cause was tried before the Circuit Court with a jury and resulted in a verdict and judgment for $5,832.85, the maximum amount recoverable under the terms of the policy, with interest. The cause was tried under a declaration as amended, consisting of three counts, to which defendant pleaded the general issue, together with a special plea to the first count, which was withdrawn on the trial under a stipulation between the parties that the defenses relied upon in said plea might be put in evidence under the general issue. Such defenses are to the effect that defendant was not liable for more than $400 because Fullenwider met his death by some unknown person intentionally firing a bullet into his body.

The three counts above referred to recited, first, that Fullenwider came to his death by bodily injuries sustained through external, violent and accidental means, to wit, by bullet wounds inflicted by certain persons, who, at the time said wounds were inflicted, assaulted Fullenwider for the sole purpose of robbery; and, second, that Fullenwider sustained bodily injuries resulting in his death solely through external, violent and accidental means in being struck by a bullet then and there accidentally discharged from a revolver held by some person (other than Fullenwider) unknown to plaintiffs; and, third, that Fullenwider sustained bodily injuries by being struck by a bullet then and there intentionally discharged from a revolver or other deadly weapon held by some person (other than Fullenwider) unknown to plaintiffs, and that Fullenwider at the time the injuries were inflicted was assaulted by said unknown person or persons for the sole

purpose of robbery. The date of the assault is averred as of December 2, 1903, and the date of death resulting therefrom as of December 3, 1903. The following portions of the accident insurance policy sued on are material to the questions in dispute, viz:

"The principal sum insured hereby is five thousand dollars.

This policy is issued and accepted subject to the following conditions and benefits:

1. The amount insured under this policy shall be payable only in case the insured shall, during the term of this insurance, sustain bodily injuries solely through external, violent and accidental means, which injuries shall, independently of all other causes, result in loss of life, limb, sight or time, as herein defined.

2. If such injuries alone cause the death of the insured, within ninety days of the happening thereof, the principal sum shall be payable to the beneficiary stated in copy of application endorsed hereon, if living.

15. In event of death, loss of limb or sight, or disability due to injuries intentionally inflicted upon the insured by any other person (except assaults committed for the sole purpose of burglary or robbery), whether such other person be sane or insane, or under the influence of intoxicants or not; or due to injuries received while fighting or in a riot; or due to the taking of poison, voluntarily or involuntarily, or to any gas or vapor; or due to injuries received while under the influence of intoxicants or narcotics, then in all such cases referred to in this paragraph the limit of this company's liability shall be one-tenth the amount otherwise payable, anything to the contrary in this policy notwithstanding."

It appears that somewhere in the neighborhood of seven o'clock in the evening of December 2, 1903, while Fullenwider was walking in a public street of Chicago in the vicinity of Forty-first street and Wabash avenue, he was held up by two men, who wrestled with him, one of whom held a revolver in his hand, and from whose grasp Fullenwider broke away and ran

in a southerly direction hallooing "robbers," "murder," "police," "help," etc., and that while he so ran hallooing the person holding the revolver shot at and mortally wounded Fullenwider, who was taken immediately to a hospital where he died from such wounds so inflicted the following day. For this cold blooded murder of a reputable lawyer and citizen of Chicago neither culprit has been apprehended and justice languishes unrequited. Was this murder one of revenge for some real or fancied wrong at the hands of the victim, or was the assault and subsequent taking of Fullenwider's life the result of an attempt to and with the purpose of robbing him? These are the crucial questions presented for solution. The jury and the trial court have determined that Fullenwider was murdered in an attempt to rob him, and that his executors, the plaintiffs in this suit, are entitled to recover with interest the maximum amount payable under defendant's policy. Defendant seeks a reversal of the judgment rendered upon this theory, and urges upon us as reasons for such reversal that the verdict and judgment are manifestly contrary to the probative weight of the proof; that the trial court should, as it was requested to do, have directed a verdict in its favor, and that it erred in the admission of improper evidence and in the giving of certain instructions at the instance of plaintiffs and in refusing to give others proffered by defendant, and in denying its motion for a new trial.

FLANNERY & McKINLEY, for appellant.

JOSEPH W. MOSES, for appellees.

MR. JUSTICE HOLDOM delivered the opinion of the court.

While the declaration presents two theories as to how Fullenwider came to his death, viz: the accidental shooting of Fullenwider and the shooting of him for the purpose of robbery, the establishing of either

of which would be within the terms of the policy, casting upon defendant a liability to respond to plaintiffs for the maximum amount recoverable under the policy; yet a careful perusal of the evidence in the record convinces us that the jury were warranted in finding from a consideration of all the evidence that Fullenwider was shot by the miscreants who stopped him and wrestled with him in an attempt to rob him. The proof sustaining the count of the declaration drawn upon such theory of liability is, regardless of the remaining counts, sufficient to support the verdict and maintain the judgment entered thereon.

At the close of plaintiffs' proofs the evidence made a sufficient *prima facie* case upon the theory that Fullenwider was shot in an attempt to rob him, justifying the court in submitting the case to the jury, and it follows that the motion of defendant to then instruct a verdict as requested was properly denied. The motion of defendant to instruct a verdict at the close of all the proofs was also properly denied, because the conflicting theories of the parties as then disclosed by the evidence presented questions of fact deducible from such evidence, the sole province of determining which the law cast upon the jury. There was evidence to weigh in reaching a conclusion upon the facts, for the case as it then stood cannot be said to be of such a nature that reasonable minds would not disagree in regard to what the evidence proved so as to make the question presented one of law for the court and not of fact for the jury.

There were but two witnesses to the circumstances of the shooting—Thomas Lowry and Grace Doyle McGuire—and each side used one of them to sustain their respective contentions; and while some conflict is apparent in their stories of the tragedy as they witnessed it from their respective points of vantage, yet there is nothing in either account, with all the inferences rationally to be indulged, which detracts from the theory of plaintiffs that the sole purpose of Fullen-

wider's assailants was robbery. As the statement in the brief of counsel for defendant is not challenged as unfair, we quote from it the substance of the testimony of these two witnesses which we regard as containing substantially all the material points covered by their testimony.

Mrs. McGuire, plaintiffs' witness, testified in substance "that in December, 1903, she lived on Forty-sixth street near Wabash avenue, and her mother lived at 4130 Wabash avenue. On the evening of the shooting she was walking north on the west side of Wabash avenue, intending to go to her mother's house. Upon arriving there she saw some one standing on the corner of Forty-first street, and, wondering who it was, walked on until she arrived at a lamp-post in front of the frame cottages, just south of the corner. She then saw two men holding Fullenwider as though they were wrestling with him, and one of them held a revolver in his hand. Fullenwider said 'Oh' or 'No,' and, breaking away from them, ran south. He turned around as he broke away, but had not gone far, had just broken away, when one of the men shot him. After the shot was fired one of the men ran northeast and the other northwest, and Fullenwider continued running south, shouting 'robbers,' 'murder,' 'police,' 'help.' 'I am shot.' She turned and went back to her mother's house to get help, and was standing on the porch when Fullenwider ran past the house. After he had passed the house a man who was on the other side of the street, just north of Forty-second street, crossed over and assisted him down to Forty-second street. She did not see any one on the west side of the street between Forty-first and Forty-second, except Fullenwider, until she saw that man cross over from the east side."

Lowry, examined for the defense, testified in effect "that he was walking south on the west side of Wabash avenue to his home on Forty-second street, and saw two men, whom he described as roughly dressed

and disreputable looking, standing near one· of the pillars under the South Side Elevated Railroad, which crosses Wabash avenue and Fortieth street. After he crossed the surface tracks in that street one of the men walked out toward him, and, when he got within three feet of him, Lowry became suspicious and turned around to recross the tracks to go west to State street, but, seeing a policeman coming down Fortieth street, he turned back and continued south on the west· side of Wabash. When he again passed the pillar both men were standing under the structure about ten feet from him, and followed about seventy-five feet behind him until he passed Forty-first street. When he was about one hundred feet south of the latter street he heard loud talking, and again turned around and saw the same two men and the insured standing on the southwest corner of Forty-first street and Wabash avenue. The two men were four or five feet apart and Fullenwider was standing between them—about two or three feet from the nearest. Fullenwider was in the act of turning away from them, south, when·the man nearest to him shot him in the back. He had just started to run and got a few feet away from his assailants, when the shot was fired. Neither of the men did anything to Fullenwider except fire the shot. They then ran in different directions, one northeast and the other west. Fullenwider hallooed for help, and ran south on the west side of the street, and Lowry went north ten or fifteen feet to meet him, and assisted him to Forty-second street, where they met Dr. Jipson, who took him to the hospital. He saw no one on the west side of Wabash avenue between Forty-first and Forty-second streets, except Fullenwider, until he met Dr. Jipson at the corner of Forty-second. When he met Fullenwider he noticed the latter wore a scarf pin and watch chain.''

The testimony shows that Fullenwider was a lawyer practicing his profession in Chicago, and that his office was in the down town district of that city; that he

was married and lived with his wife at 472 Forty-second street in a residence district of Chicago about half a block east of Grand boulevard: that he was the owner of a flat building at 4031 State street, on which he was superintending the making of some repairs. Between five and six in the evening of the day he was shot, he left his office for his home, going first to his flat building, which he left within an hour of the time he started from his office, and walked in the direction of his home, and was halted in the vicinity of Wabash avenue and Forty-first street by two men and shot while in the act of fleeing from them. Defendant argues that the men who assaulted Fullenwider mistook him for the witness Lowry. The evidence shows a dissimilarity of appearance between the two men which would preclude the possibility of mistaken identity, Lowry being tall and slender and Fullenwider short and stout. There is, moreover, to our minds, nothing in the evidence from which to divine any reason why these men should wish to slay Lowry in cold blood.

Nothing in the evidence would, to our minds, permit of such an assumption. One great difficulty with defendant's contentions lies in the fact that they rest in naked assumptions and improbable conjectures, without an atom of evidence upon which to ground them. Lowry swears that Fullenwider's assailants were two men "roughly dressed" and "disreputable looking." The time was early evening on a dark winter night. What more reasonably probable than that these men were footpads, awaiting a victim to dispossess of his personal belongings? What characteristics of "hold up" men more marked than Lowry's description of these two men as "roughly dressed and disreputable looking" could be imagined? They were typical of their class. The jury were to weigh the evidence in the light of their knowledge and experience of the affairs of life, gained in their several callings and business. Presumably they were residents of Cook county or they would not have been on the jury,

and as juries go, the major portion of them reside and do business in Chicago. It is common knowledge that citizens are often robbed in large cities under circumstances similar to those surrounding Fullenwider at the time he was shot. What other conclusion could the jury have reached under the evidence and with such knowledge, coupled with the exclamations made by the victim in his effort to escape, of "murder," "robbers," "police," "help," and the lack of any testimony that Fullenwider was assailed by these men for any other purpose? One of the men held a revolver over Fullenwider at the time Mrs. McGuire first saw the contest, and in the light of Fullenwider's action what more reasonably probable than that these men demanded his money in regular highwayman fashion when they first seized him? It seems to us to be the only rational and reasonable solution of these facts that robbery was the sole purpose of the attack. But counsel for defendant urge that while the original attack may have had for its purpose robbery, that when Fullenwider broke away and ran, the purpose of his assailants was instantly changed from an intent to rob to a feeling of hatred and anger at the escape of their victim, so that the shot was fired in revenge and with murderous intent. We regard such contention as unreasonable and illogical and unsupported in the slightest degree by any testimony sanctioning such an inference. To our minds the only reasonable and natural inference to be drawn from the testimony is, that the original assault was for the purpose of robbery; that the fleeing of the victim made it evident that the intention of the assailants was likely to be thwarted, to prevent which the shot was fired, and that the purpose of robbing the victim was frustrated by the approach of pedestrians impelling the assailants to desist from their purpose of robbery and to flee in an effort to escape arrest for the dual crime of which they were at the moment of fleeing guilty. This reasonably accounts for the valuables on the person of Fullenwider not

having been disturbed. The robbers met a condition of resistance which they evidently had not anticipated. The credibility of Mrs. McGuire is impugned by defendant's counsel. While we do not regard the slight discrepancies between the stories of Mrs. McGuire and Lowry as at all important in their bearing upon the incidents related by each, yet the determination of the credibility of the witnesses and the harmonizing of their evidence was the duty of the jury, with which we have no right to interfere unless it is clear that their solution of the testimony is contrary to the manifest weight of the evidence or the result of passion or prejudice on the part of the jury. We fail to find any of these disturbing elements present or inferable from the conclusions at which the jury arrived.

Whether Fullenwider met his death through accidental discharge of the revolver in the hands of one of his assailants, or whether he was shot for robbery or for revenge, were the issues before the jury, and they rested for their determination upon evidence of a circumstantial character to be drawn · from facts clearly proven.

The assault and the shooting of Fullenwider are proven facts. The motive and intent of the assailants rest in circumstances to be drawn from these facts and the actions of the parties engaged in the assault; so that the fact that Fullenwider in his attempt to escape cried "robbers" is a circumstance which, together with the other evidence, the jury was justified in taking into consideration in determining the issues before it, and warranted its conclusion that the purpose of the shooting was robbery. As said by this court in an opinion by Mr. Justice Brown in Wilkinson, Excr. v. this defendant, 144 Ill. App. 38, "Circumstantial evidence is frequently as satisfactory, and not infrequently more satisfactory, than direct evidence, to establish the existence or occurrence of any fact, and in accordance with this hypothesis all the affairs of men are conducted." Much of the reason-

ing of the Wilkinson case is enlightening of many of the questions presented in discussion here. Much of the interesting argument and citation of authority of the learned counsel for defendant is of little importance, in the view we take of the probative force of the evidence as above indicated.

There is evidence in the record at least tending to sustain both theories of the manner in which Fullenwider came to his death, on the issues joined in the declaration under which the parties proceeded to trial. It became the duty of the jury to decide upon which theory, if either, the evidence, with all legitimate inferences to be drawn from it, proved Fullenwider was killed. To enable the jury to arrive at a correct conclusion as to the probative force of the proofs, it became necessary that they should be instructed as to the law governing both theories presented by the evidence and the pleadings. It follows that the learned trial judge in so doing adhered to legal precedent, and that such action was without error. But were this not so, defendant by offering and procuring to be given to the jury similar instructions upon both of these theories, is disqualified from now raising the question against the opposing party. C. & A. R. R. v. Harbur, 180 Ill. 394. The jury were correctly instructed that it was not necessary to a recovery to prove the material averments of any count of the declaration by direct and positive evidence, but that such averments could be proved by circumstantial evidence. We think that the instructions as to circumstantial evidence were amply safeguarded to prevent the jury from reaching a conclusion founded on mere conjecture or surmise. Were language of caution lacking in the instructions given at the instance of plaintiffs, it is apparent that one given at the request of defendant, which told the jury that they had no right to indulge in conjectures or speculations not supported by the evidence, and "that in determining whether the injuries to insured were or were not effected through

accidental means, or whether they were or were not intentionally inflicted upon him by any other person for the sole purpose of robbery, the jury must confine themselves to the evidence and such inferences as they believe may be rightfully and reasonably inferred from the evidence,'' etc., furnished a sufficient corrective. We have not discovered in any of the instructions given, after carefully examining them, any error calling for a reversal of the judgment. They fairly presented the law upon the issues joined as applied to the evidence, enabling the jury to apply the law so given in determining the probative force and weight of such evidence. Whatever may be said in favor of the giving of the refused instructions complained about, we are convinced that the instructions as a whole fairly presented all the law to the jury necessary for them to reach a correct conclusion on the whole case.

We are of the opinion, for reasons already given, that the trial at *nisi prius* was fair and in accord with legal precedent, and that the judgment of the Circuit Court does justice between the parties and ought to be, and therefore is, affirmed.

*Affirmed.*